ond marriage, the one in issue here. Moreover, the trial court may have found that the defendant sustained the burden of disproving the validity of the second marriage.

Under the law and the facts, the judgment of the trial court was correct and will be affirmed.

*Judgment affirmed.*

CUSHING and BUCHWALTER, JJ., concur.

---

HARRISON v. THE STATE OF OHIO.

*Criminal law—Fraudulent statement as to financial condition of corporation—Section 13175, General Code—Oral statement as basis of prosecution—Sufficiency of indictment—Words "wilfully exaggerated" not indefinite—Preliminary facts may be stated, followed by offense proper—Actual sale of stock unnecessary, and allegations thereof surplusage—Evidence not bearing on intent, inadmissible—Statement in prospectus that corporation "has" property, means ownership.*

1. An oral statement may be made the basis of a criminal charge under Section 13175, General Code.
2. The words "wilfully exaggerated," as used in that section, are not too indefinite to sustain a criminal charge.
3. An indictment under Section 13175, General Code, is not defective by reason of the statement of preliminary facts in one sentence, followed by the offense proper in the following portions of the indictment.
4. An actual sale of stock is not required by Section 13175, General Code, but the allegations of the indictment as to

[1] Corporations, 14a C. J. § 2073; [2] Id.; [3] Id.; [4] Id.; [5] Id.; [6] Id.; Have, 29 C. J. § 3 (Anno.).

such sales may be treated as surplusage and disregarded.

5. While liberality is allowed both the state and the defense in the admission of evidence upon the issue as to intent to deceive prospective purchasers of stock, yet evidence having no bearing on such intent may be rejected.

6. The word "has," used in the prospectus of a corporation with reference to its property, in the absence of explanatory or qualifying words. means ownership.

(Decided August 14, 1924.)

ERROR: Court of Appeals for Franklin county.

*Mr. Smith W. Bennett, Mr. Cornelius J. Mattern,* and *Mr. Robert R. Nevin,* for plaintiff in error.

*Mr. John R. King,* prosecuting attorney, and *Mr. Joseph A. Godown,* assistant prosecuting attorney, for defendant in error.

ALLREAD, J.    Dwight Harrison and William G. Benham were jointly indicted on a charge of knowingly making a false and wilfully exaggerated statement as to the ownership by the Phoenix Portland Cement Company of Ohio of certain property, with intent to deceive purchasers of the preferred stock of that corporation as to the real value thereof.

Harrison was put on trial and convicted. A motion for new trial was overruled, and the defendant was sentenced to three years in state's prison. He now prosecutes error to this court.

The indictment was framed under the following statute:

"Sec. 13175.    Whoever knowingly makes or publishes, or permits or causes to be made or published, a book, prospectus, notice, report, statement,

exhibit or other publication of or concerning the affairs, financial condition or property of a corporation, joint stock association, co-partnership or individual, containing a statement which is false or wilfully exaggerated and intended to deceive any person as to the real value of any shares, bonds or property or part thereof, of said corporation, joint stock association, co-partnership or individual, shall be fined not less than one hundred dollars nor more than ten thousand dollars or imprisoned in the penitentiary not less than one year nor more than five years, or both.''

It is urged that the words "wilfully exaggerated,'' as used in the statute, are too indefinite to constitute a definition for crime. We think not. "Exaggerated,'' if used alone, might be open to objection, but we think when qualified by the word "wilfully,'' it is sufficient.

The General Assembly has by statute endeavored to relieve criminal prosecutions and especially indictments from purely technical errors, and the recent trend of the Supreme Court has been in the same direction. In the case of *State* v. *Schaeffer*, 96 Ohio St., 215, a statutory provision more indefinite than the one here under consideration was sustained.

Objections are also made to the form and legality of the indictment. It is urged that the indictment contains three separate counts, that each must be considered separately, and that none standing alone is sufficient.

Examining this indictment, we find that it contains three separate clauses or sentences, but that none of them are denominated separate counts. It

was evidently the purpose of the pleader to state the preliminary facts in the first clause and to state the offense in different forms in the other clauses. The preliminary facts would, in our judg-ment, be applicable to the other clauses, and, inas-much as the second and third clauses, which con-tain the offense proper, might have been joined in one count, we see no objections to the same being separated into two sentences or counts. We think this pleading is permissible under the liberal rule now prevailing in respect to an indictment.

The objection as to the averment in the indict-ment of the actual sale of said stock may be con-sidered surplusage. This question we think is fully covered by the recent case of *State* v. *Schultz,* 96 Ohio St., 114. The indictment there was drawn upon similar lines, and it was held that the addi-tional averment should be regarded as surplusage, under Section 13581, General Code.

The next objection relates to the averment in the indictment that the statement which is the basis thereof was both oral and written. The objection is that an oral statement is not within the scope of Section 13175, General Code.

The doctrine of *ejusdem generis* is invoked, and it is claimed that the word "statement," as men-tioned in the statute, must be construed with the context and be limited to written matter capable of publication as such. The doctrine of *ejusdem generis* is limited to those statutes where no con-trary inference arises. It was not intended to sub-vert a meaning plainly expressed. The doctrine is fully discussed by Judge McIlvaine in the case of *Woodworth* v. *State,* 26 Ohio St., 197 and 198.

The statute under consideration is very comprehensive, and was intended to strike at the root of fraudulent stock selling, and the language employed in our judgment clearly negatives the idea that only written or printed matter in published form was intended.

The statute says, "whoever * * * makes or publishes * * * a statement," etc. This would indicate that something more than a written publication was contemplated. If the concluding words "or other publication" had not been used in the statute, then all the descriptive words "book, prospectus, notice, report, statement, exhibit," would have been taken in their natural meaning and would not have been confined to writings or printed matter. The words, "or other publication," were not intended to limit the words already used, but to add publications not specifically described.

It is urged by counsel with considerable earnestness that the liberal rule as to the formalities of indictments should not be carried so far as to destroy the right of the accused to a concrete description of the charge against him. We agree with the general doctrine so asserted, but we do not believe that the present indictment transgresses that rule. The defects noted in the indictment in the *Coblentz case*, 84 Ohio St., 235, have been supplied in the present indictment. Counsel contend that Section 13175 should be construed with Section 13104, the false pretense statute, and with Section 13194 (103 O. L., 43), in regard to the sale of securities. These statutes are to some extent *in pari materia*. But we cannot escape the conclusion that Section 13175 was intended to apply

to cases arising out of the sale of corporate stocks.

In the experience of recent years many corporations have been floated purely for stock-selling purposes. These ventures, in the hands of unscrupulous promoters, aided by attractive and highly-colored prospectuses, and the glib statements of salesmen, have proved disastrous to many people of moderate means who risked and lost their savings.

These were the cases the statute was intended to reach. It would be a great pity, if not indeed a tragedy, if this remedial statute were so emasculated as to exclude oral statements or so as to reduce criminal responsibility to a mere misdemeanor.

To eliminate oral statements from this statute would give these corporation adventurers a new lease of life. They would eliminate the written and printed matter and broadcast the poison fumes by word of mouth. This was not contemplated by the statute, and should not be forced by judicial construction. Sections 13104 and 13194 (103 O. L., 43) have their field of operation, but we see no reason why the state may not plant its prosecution in the present case squarely upon Section 13175.

This brings us to the trial.

### PRELIMINARY FACTS.

The R. L. Dollings Company was a promotion and stock selling corporation. William G. Benham and Dwight Harrison were the chief officers and active managers of the Dollings Company.

Harrison had some previous connection with the business of manufacturing cement and took up and became interested in a plan of promoting an extensive cement manufacturing plant. The idea was his.

Lindley C. Morton owned and controlled substantially all of the stock of the Phoenix Portland Cement Company of Pennsylvania, which company owned a large cement manufacturing plant at Nazareth, Pennsylvania, and held an option or contract for another plant in process of building at Birmingham, Alabama.

Morton made inquiry at the Philadelphia office of the Dollings Company as to the possibility of securing financial aid for his company. This led to negotiations looking toward the acquisition of the property of the Pennsylvania Company by the Dollings Company. Harrison was the active man. August 17, 1923, the Phoenix Portland Cement Company of Ohio was incorporated. Its authorized capital stock was ten million dollars preferred, and a hundred thousand shares of common, no par value. This Ohio corporation was designed as the active subsidiary to undertake and carry on the enterprise. Following the incorporation of the Ohio Phoenix Company a meeting of district managers and salesmen of the Dollings Company was held at the Elks Country Club, Columbus, Ohio. Harrison addressed the meeting, explaining the proposed enterprise.

Prospectuses were printed and issued, and preferred stock in the amount of about $2,500,000 was sold to various purchasers in Ohio and other states.

THE CRIMINAL OFFENSE.

The offense charged consisted of the following elements:

(1)   Oral and written statement that the Ohio Phoenix Company owned the Nazareth plant and certain property at Birmingham, Alabama.

(2)   That such statement was false.

(3)   That such statement was knowingly made and with intent to deceive prospective purchasers of stock.

The state offered evidence tending to prove certain oral statements made by Harrison at the Elks Country Club, and to prove that certain prospectuses were issued and placed in the hands of salesmen and prospective purchasers of stock. The state's evidence tended to prove that Harrison personally approved the prospectuses. Harrison in his testimony admits that he made a speech at the Elks Country Club, but denies that he made the particular statements as to the ownership of the Nazareth plant and the Birmingham property. He admits, or at least only feebly denies, authorizing the issuing of the prospectus known as Exhibit N, and denies that he ever saw the so-called broadside prospectus until about the time of the trial.

Taking up the elements of the crime, we are clear that the evidence was sufficient to sustain a verdict finding that Harrison made the oral statements at the Elks Country Club claimed by the State, and that he authorized the issuing of the two prospectuses known as Exhibits N and V.

The indictment charges that Harrison stated that

the Ohio Company owned the Nazareth plant and the property at Birmingham, Alabama. The prospectus "Exhibit N" contains the following statement:

"The Phoenix Portland Cement Company, General Offices, Columbus, Ohio.

"This company which the R. L. Dollings Company is to expand has a large plant at Nazareth, Pennsylvania, which is now producing a million barrels of cement a year. For the past twenty-two years the company has manufactured and marketed a very high grade product, which has been used in many important construction projects throughout the United States. Phoenix Portland Cement enjoys a splendid reputation and is specified by numbers of architects and contractors.

"On August 28 the company started work on a new plant in Birmingham, Alabama. When this is completed it will be the largest plant in the South and the most modern and efficient plant in the country. It is expected that this plant will be in operation in May, 1923.

"Additional plants are to be erected or acquired in other sections of the country."

The evidence offered by the state shows, if indeed the same is not undisputed, that at the time these statements and representations were made the Ohio Phoenix Company had no legal or enforceable title whatever for either the Nazareth plant or the Birmingham property, and had made no payments thereon except perhaps a small payment to hold the contract for the Birmingham property. No written contract definitely fixing the terms of purchase by the Ohio Company of the

stock or property of the Pennsylvania Company was actually entered into until February 8, 1923. In the meantime, preferred stock of the Ohio Company, aggregating about $1,500,000, was sold by the so-called high-powered salesmen of the Dollings Company. The first actual payment by the Ohio Phoenix Company was made at the time of the execution of this contract, and the amount paid was $202,000 on a purchase price of $1,402,000. Subsequent to the execution of the February contract, additional preferred stock in the Ohio Company, amounting to almost a million dollars, was sold.

Some time in the latter part of April, or about the first of May, the sale of preferred stock of the Ohio Phoenix Company fell off to such an extent that it was found necessary to cancel the contract with the Pennsylvania Company. At this time $402,000 had been paid to the Pennsylvania Company on the said purchase. This sum was paid out of the proceeds of the sale of preferred stock of the Ohio Phoenix Company, and was all that ever was paid on the purchase price of the Nazareth plant. After some negotiations, the contract, so far as it related to the purchase of the stock of the Pennsylvania Company, the Nazareth plant, was cancelled, and thereafter the company had no shadow of claim to the Nazareth plant. Notwithstanding this situation the prospectuses continued in circulation and more than $200,000 of stock was thereafter sold, and the purchase money paid. In the settlement the property at Birmingham, Alabama, was transferred to the Ohio Phoenix Company, subject to certain restrictions,

among which was a lease of the Alabama property to the Pennsylvania Phoenix Company for fifty years.

So far as the evidence is concerned we may confine our consideration to the Nazareth plant. If the statement was false as to that, and if there was no error in the trial, it would be sufficient to sustain the findings of the jury in this particular. Counsel for the defendant argue that the word "has," used in the prospectus, relates only to possession, or an equitable right. The word "has," as used in the context of the prospectus, is in our judgment equivalent to "owns." That is a reasonable interpretation of the language used. It is clear that the Ohio Phoenix Company never had any legal or equitable ownership of the property, as represented.

We reach the conclusion that the evidence was clearly sufficient to sustain the charge in the following particular, to-wit, as to knowingly issuing the statement and the falsity thereof.

We also find that there was no prejudicial error in respect to these elements of the offense.

The remaining issue is the element of intent to deceive.

Upon this subject Harrison (Record, page 1458) testifies:

"Q. The particular prospectus here, this Exhibit N in this case, what was the object and purpose? A. This prospectus was prepared and gotten out for the purpose—in connection with the sale of the securities of the corporation, the preferred stock.

"Q. To go to whom? A. Now I don't know what you mean by that question.

"Q. Who was to use that if it had no purpose in selling stock, who was to use it? A. It was to be used by the sales department of the R. L. Dolling's Company."

If we concede, therefore, that the evidence was sufficient to sustain the jury in finding that Harrison authorized the prospectus represented by Exhibit N, and that the same was knowingly false, this testimony of Harrison's would carry with it the inference of an intent to deceive.

### Admission of Harrison's Testimony Taken in the Civil Case.

We think this testimony was competent under the case of *Burke* v. *State*, 104 Ohio St., 220.

### Exclusion of Evidence.

This is perhaps the most important and most difficult feature of the case.

A latitude was allowed the state in offering evidence tending to show circumstances surrounding the statements of Harrison, the operation of the sales department of the R. L. Dollings Company, and the making of sales of stock to various purchasers. This was proper upon the issue of intent to deceive. The defense offered testimony and documents relating to the management of the company and the alleged good faith of the defendant in making and attempting to carry out the negotiations and contract with respect to the stock and

property of the Pennsylvania Phoenix Company.
The exclusion of this line of evidence involved a
substantial feature. The objection does not rest
merely upon the ruling out of items here and there,
but strikes at the whole theory of the defendant
in making his defense. It is claimed that this evi-
dence was competent to rebut the evidence of the
state on the question of intent, and as tending to
prove the defendant's good faith. It is well estab-
lished that a reasonable latitude on the subject of
intent is allowed the state, and it would also fol-
low that a similar latitude should be allowed the
defense. The question therefore is decisively
made. Was the evidence offered by the defense
competent?

The rule is thus stated in 8 Ruling Case Law,
page 182:

"If it be asked what limit is to be placed on
the range of such an inquiry, the answer is obvi-
ous. It cannot be extended to facts or circum-
stances which do not naturally or necessarily bear
on the issue to be established, precisely as evi-
dence of all collateral facts and circumstances must
be confined to the proof of those which have a
legitimate and direct connection with the principal
transaction."

We must keep in mind that the intent charged
in the indictment did not relate to the good faith
between Dollings officials and Lindley C. Morton
or the Pennsylvania Phoenix Company. If it did,
all this evidence would be competent. The offense
charged involved an intent to deceive prospective
purchasers of preferred stock of the Ohio Phoenix
Company. Consequently the good faith which

might raise an inference against the state's case
was the good faith of the defendant in the sale of
the stock and with reference to prospective pur-
chasers. We think it would have been misleading
to have allowed the admission of evidence tending
to prove the good faith of the defendant in mak--
ing and carrying out his contract with Lindley C.
Morton and the Pennsylvania Phoenix Company.
That was entirely aside from the issues here involv-
ed. We cannot escape the conclusion that the trial
court was justified in excluding this line of evidence.
A special point was made as to the exclusion of the
telegram of June 6, 1922, purporting to show that
some sort of an agreement or understanding had
been reached for the ultimate purchase by the
Dollings Company or its representative of the
stock and property of the Pennsylvania Phoenix
Company. This telegram standing alone was not
sufficient to prove title or ownership in the subse-
quently formed Ohio Phoenix Company, and would
not be competent evidence upon any issue in the
case without a proffert of additional evidence to
prove that ownership had actually been consum-
mated, as represented in the statement upon which
the indictment was founded. In the absence of
such proffert there was no prejudicial error in ex-
cluding the telegram of June 6.

The same may be said of the other exhibits
offered showing the progress of the negotiations
with Morton. It is said that there was no proof
of the actual value of the stock. If the statement
upon which the indictment was founded had been
that the stock was of a definite value, then evidence
of value would have been competent, if not neces-

sary. When, however, the offense relates to a statement of the property and assets of the corporation, which would indirectly affect the value of the stock, no direct evidence as to the value of the stock is necessary. The jury may draw an inference from the circumstances as to whether there was an intent to deceive as to the actual value of the stock.

## THE CHARGE OF THE COURT.

The special charges requested by the defendant before argument were properly refused upon the authority of *Wertenberger* v. *State*, 99 Ohio St., 353.

The general charge upheld the right of the state to prove oral as well as written or printed statements. This is in harmony with our construction of the statute under which the indictment was drawn.

On the subject of intent the court stated that intent might be shown by the circumstances, and that "It is a general principle of law that what a man does or says wilfully he intends to do or say and that he intends the natural and reasonable consequences of his voluntary acts or words, unless the circumstances are such as to indicate the absence of such intent." Whatever may be the rule in other jurisdictions we are of opinion that the law of our state justifies this charge.

The court in the general charge limited testimony as to the purchase of preferred stock and as to statements made by salesmen in connection with such purchases, ruling that they were competent

on the question of intent and were to be considered
solely for that purpose; so also with reference to
statements of the defendant below in regard to
a surplus fund. Such evidence was competent on
the subject of intent, and having been so limited
by the court there was no prejudicial error in this
respect.

We have carefully considered the entire charge
and are of the opinion that it sufficiently covered
the case and is free from prejudicial error.

Finding no prejudicial error the judgment must
be affirmed.

*Judgment affirmed.*

KUNKLE and FERNEDING, JJ., concur.